UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DEREK DAY**, <br><br> Plaintiff, <br><br> v. <br><br> **LONNIE G. BUNCH, III,** <br><br> Defendant. | Civil Action No. 24-cv-1593 |

## MEMORANDUM OPINION

Plaintiff Derek Day, a Black man over the age of 60, applied for the position of Supervisory Police Officer at the Smithsonian's Office of Protective Services seven times between 2014 and 2021. Management chose someone else each time, ostensibly because Plaintiff was not a veteran. Plaintiff alleges that Defendant also changed his work schedule, preventing him from taking care of his sick wife, spread rumors about him, gave him an undeservedly low performance rating, and failed to inform him about certain training events.

Plaintiff brought a six-count Complaint, alleging hostile work environment and discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the Age Discrimination in Employment Act. Defendant moves to dismiss it. Def.'s Mot. to Dismiss at 1–18, ECF No. 9 ("MTD"). For the reasons below, the court will GRANT in part and DENY in part Defendant's motion.

I.   BACKGROUND

A. Factual Background

Plaintiff is a police sergeant with the Smithsonian's Office of Protection Services ("OPS"). Compl. ¶¶ 17–18, ECF No. 1 ("Compl.").

On January 12, 2014, Plaintiff applied to be a Supervisory Policy Officer. *Id.* ¶ 24. OPS Chief Terrell Wilson and former Director Jeanne O'Toole, both White, instead chose then-Sergeant Shawntane Taylor, a Black man. *Id.* ¶¶ 25, 32; Def.'s Ex. A, Smithsonian Rep. of Investigation, at 0312, ECF No. 9 ("Def.'s Ex. A").[1] Plaintiff claims that Taylor had "considerably less law enforcement experience than he did." Compl. ¶ 25. When Plaintiff asked why he was not promoted, he was told, although it is unclear by whom, that it was because he "was not a veteran." *Id.* ¶ 26.

After Taylor became a Lieutenant, he allegedly asked Plaintiff "on numerous occasions" when he would retire because of his age. *Id.* ¶ 28.

On June 24, 2015, OPS once again denied Plaintiff's application to be a supervisor because he was not a veteran. *Id.* ¶¶ 30–33. Chief Manson, OPS Director O'Toole, and Assistant Chief Luke Cassidy, all White, selected Jeffrey Mathews, another White male, for the position. *Id.* ¶ 32.

Plaintiff also alleges that Taylor stated that he, along with other leadership, were "trying to change the culture" of the predominantly Black police department. *Id.* ¶¶ 27, 34.

In 2016, Plaintiff applied twice more to become a Supervisory Police Officer, on November 3 and December 13. *Id.* ¶¶ 35, 37. Each time, OPS allegedly "preselected" a White male veteran for the role. *Id.* ¶¶ 36, 38.

---

[1] The court may consider "documents upon which the plaintiff's complaint necessarily relies even if the document is produced by the defendant on the motion to dismiss." *Stocks v. Cordish Companies, Inc.*, 118 F. Supp. 3d 81, 84 (D.D.C. 2015) (internal quotation marks and citation omitted). Exhibit A is an excerpt of Defendant's investigation into Plaintiff's complaint with the Smithsonian's Equal Employment and Supplier Diversity Office. Because Plaintiff took part in the investigation, Defendant authored it, and there is no dispute as to its validity, the court will consider Exhibit A for purposes of this Memorandum Opinion. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133–34 (D.C. Cir. 2015) (holding that the court can consider "an attachment to the defendant's motion to dismiss" "as incorporated into the complaint" so long as it also considers why the defendant "attached the documents, who authored the documents, and the reliability of the documents").

On April 25, 2018, Taylor and Cassidy issued a management schedule for supervisors. *Id.* ¶ 39. Thereafter, Plaintiff received a memo—it is unclear when and from whom—that he was being assigned a different schedule because management concluded that he was a deficient supervisor. *Id.* ¶ 40. On May 6, 2018, Taylor and Cassidy reassigned Plaintiff to a new shift of six days on and two rotating days off, because he lacked "supervision skills and responsibilities." *Id.* ¶¶ 41–42, 46. The new shift was a "substantial and detrimental change" to Plaintiff's schedule, *id.* ¶ 41, which had previously been five days a week, from 4 PM to 12 AM, Sundays through Thursdays. *See id.* ¶ 42. Because of the shift change, Plaintiff had less time to take care of his "extremely sick" wife, *id.* ¶ 44, and "lost his night differential pay." *Id.* ¶ 45. When Plaintiff told Taylor that the schedule change caused "hardship to [him] and his family," Taylor responded that he was "just following orders" and "that sometimes one had to go backward before he could go forward." *Id.* ¶ 43.

Plaintiff claims that Taylor and Cassidy also tried to give his old schedule to their friend, Assistant Sergeant Watson, a White male. *Id.* ¶ 47. Once Plaintiff hired an attorney to "fight against this disparate treatment," and the attorney "notified OPS's upper management about Plaintiff's claim," Cassidy and Taylor attempted "to change all" the supervisors' shifts and schedules. *Id.* ¶ 48. Three other supervisors, all of whom were Black, allegedly resigned in response. *Id.*

A year later, in 2019, Plaintiff received a low performance rating, despite having previously received all "Outstanding" or "Highly Successful" evaluations. *Id.* ¶ 51.

Plaintiff alleges three incidents in 2020. First, in April, Taylor accused Plaintiff of saying that a recently deceased officer had "eaten his gun." *Id.* ¶ 52; *see also id.* ¶¶ 53–55. Second, in June, Taylor did not inform Plaintiff about the D.C. Metropolitan Police Department's investigator

training and denied him the opportunity to attend other trainings that "would have enhanced his career at the agency." *Id.* ¶¶ 57, 59; *see also id.* ¶¶ 56–60.  In July, Plaintiff received a Letter of Reprimand from Taylor for not attending at least one control room emergency notification training. *Id.* ¶ 61.  Plaintiff submitted a grievance to then-Chief Covington, who took no action. *Id.* ¶ 63. Third, in October, Taylor fabricated an exchange between Sergeant Matthews and Plaintiff "to make the two sergeants angry with each other." *Id.* ¶ 64.  Plaintiff reported this incident to Covington, who, again, took no action. *Id.* ¶¶ 65–66.

On March 13, 2021, Plaintiff applied for the fifth time to become a Supervisory Police Officer. *Id.* ¶ 67.  Sometime after July 15, Plaintiff learned that he was not selected; OPS chose then-Lieutenant Taylor for the position instead. *See id.* ¶¶ 71, 74.  Plaintiff claims Taylor was selected because Chief Wilson, Taylor's friend, was on the board that made the hiring decision. *See id.* ¶¶ 71, 73–74.  On July 17, Plaintiff applied for two different supervisory positions. *Id.* ¶¶ 75–76.  On August 19, Plaintiff learned that he was not selected even though his applicant score was in the "Best Category," and Velasquez was selected despite not being a veteran. *Compare id.* ¶¶ 58, 71, 75–77, 84, *with* Def.'s Ex. A at 0321 (indicating that Velasquez was selected for the Lieutenant position posted in July); Pl.'s Opp'n at 7, ECF No. 11 ("Opp'n").  On January 16, 2022, other OPS employees reported to Plaintiff's superiors that he told a sick officer to come to work despite knowing he had COVID-like symptoms.  Compl. ¶¶ 82–85.  That employee later emailed another Lieutenant, denying that Plaintiff ordered him to come in to work. *Id.* ¶ 85.

B. **Procedural History**

Plaintiff first contacted the Smithsonian's Equal Employment and Supplier Diversity Office ("EESDO") on August 29, 2021. *Id.* ¶ 80.  He then filed a formal complaint with EESDO on November 21, 2021, *id.* ¶ 81, amending it on February 12, 2022, and alleging sex, race, and age discrimination, and retaliation. *Id.* ¶ 86.  In 2023, Plaintiff filed a charge with the Equal

Employment Opportunity Commission ("EEOC"), alleging the same claims in his EESDO complaint. *Id.* ¶ 6.

On June 27, 2023, the EEOC permitted Plaintiff's allegations of events before July 15, 2021, to be considered for summary judgment on his hostile work environment claim. Defs.' Ex. E, EEOC Case Mgmt. Order, at 2–3, ECF No. 9-1 ("Defs.' Ex. E"). On February 20, 2024, the EEOC granted summary judgment for Defendant. Compl. ¶ 7. On March 1, 2024, it issued Plaintiff a right to sue within 90 days' notice. *Id.* ¶ 8

## II. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests whether a complaint "states a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). While detailed factual allegations are not necessary to withstand a Rule 12(b)(6) challenge, a plaintiff must still provide "more than labels or conclusions" or a "'formulaic' recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) (citation omitted). The complaint must "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible only when a plaintiff pleads sufficient factual content that allows the court to "draw reasonable inference that the defendant is liable for the misconduct alleged." *Id*. While the court must assume that any "well-pleaded factual allegations" in a complaint are true, conclusory allegations "are not entitled to the assumption of truth." *Id.* at 679.

## III. ANALYSIS

### A. Administrative Exhaustion

Defendant argues that because Plaintiff did not contact EESDO until August 29, 2021, each allegation in his Complaint preceding July 15, more than 45 days before, is unexhausted. MTD at 6–9. Plaintiff responds that his claims are exhausted "because he was never informed" that he had

only 45 days to make a report to EESDO after each discriminatory act, and thus "was unaware of any obligation to do so to protect his rights." Opp'n at 4.

Under Title VII and the ADEA, before a plaintiff can sue in federal court, they must timely pursue and exhaust administrative remedies. *Hamilton v. Geithner*, 666 F.3d 1344, 1349 (D.C. Cir. 2012) (applying administration exhaustion in the Title VII context); *Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 172 (D.D.C. 2016) (same but under the ADEA). "[P]ersons who believe they have been discriminated against on the basis of race," 29 C.F.R. § 1614.105(a), "must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory[.]" *Id.* § 1614.105(a)(1). The time for filing an EEOC charge starts to run when a plaintiff has "reasonable suspicion" that he has been discriminated against. *McCants v. Glickman*, 180 F. Supp. 2d 35, 40 (D.D.C. 2001).

The 45-day limit is tolled, however, when a plaintiff shows that he "did not know and reasonably should not have" " known that the discriminatory matter or personnel action occurred." 29 C.F.R. § 1614.105(a)(2). This requirement need not meet a "strict theory of constructive notice." *Harris v. Gonzales*, 488 F.3d 442, 445 (D.C. Cir. 2007). Rather, it involves a "two-step inquiry: (1) whether notification of the time requirements was provided, and (2) whether the notification was reasonably geared to inform the complainant of the time limits." *Id.* (internal quotation marks and citation omitted). But if record evidence shows that the plaintiff had reasonable suspicion that he was the victim of discrimination and still did not timely report it to his EEOC office, equitable tolling does not apply. *Johnson v. Gonzales*, 479 F. Supp. 2d 55, 59–60 (D.D.C. 2007); *Aceto v. England*, 328 F. Supp. 2d 1, 7 (D.D.C. 2004) (If "plaintiff knew, or should have known, about the alleged discriminatory action 45 days prior to his filing," and did not report it, his allegations are unexhausted.).

Plaintiff's argument—raised only in his opposition brief—that he did not know about the reporting deadline is unavailing. Opp'n at 4. The D.C. Circuit has repeatedly emphasized that a plaintiff has the burden to plead and prove equitable reasons to excuse a failure to comply with the 45-day requirement under 29 C.F.R. § 1614.105(a)(2). *Saltz v. Lehman*, 672 F.2d 207, 209 (D.C. Cir. 1982); *see Young v. SEC*, 956 F.3d 650, 655 (D.C. Cir. 2020) ("The party arguing for equitable tolling bears the burden of demonstrating entitlement to it.").

Plaintiff pleads no facts or circumstances and points to no evidence from which the court could find that he meets the factors set forth in *Harris*. Opp'n at 4. Absent any factual allegation other than his declared ignorance of the reporting deadline, the court cannot find that equitable tolling applies.

Moreover, it appears that Plaintiff had reasonable suspicion of Defendant's discriminatory conduct well before July 15, 2021, as he states that he sought legal representation to address OPS's discriminatory conduct in 2018—three years before he contacted EESDO in August 2021. Compl. ¶¶ 24–48, 81; Def.'s Reply at 3, ECF No. 13.

Accordingly, the court finds that Plaintiff did not exhaust his allegations pertaining to sex, race, and age discrimination, retaliation, and Section 1981 claims before July 15, 2021, and therefore the court cannot consider them.

### B. Hostile Work Environment (Count III)

The court can, however, consider Plaintiff's allegations of events occurring before July 15, 2021, for his hostile work environment claim "if they are adequately linked." *Baird v. Gotbaum*, 662 F.3d 1246, 1250 (D.C. Cir. 2011).

#### i. Administrative Exhaustion

As the Supreme Court has noted, "hostile environment claims are different in kind from discrete acts." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). "The unlawful

employment practice . . . cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* at 115 (internal quotation marks omitted). "It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117.

Although *Morgan* permits consideration of time-barred acts as part of a hostile work environment claim, it is not "an open sesame to recovery for time-barred violations." *Baird*, 662 F.3d at 1251. "Both incidents barred by the statute of limitations and ones not barred can qualify as 'part of the same actionable hostile environment claim' only if they are adequately linked into a coherent hostile environment claim—if, for example, they 'involve the same type of employment actions, occur relatively frequently, and are perpetrated by the same managers.'" *Id.* at 1251 (quoting *Morgan*, 536 U.S. at 120–21) (alterations omitted).

Plaintiff's pre-July 15 allegations are neither "identical" nor do they "take the same form," but they have a "common thread" among them. *Mason v. Geithner*, 811 F. Supp. 2d 128, 178–79 (D.D.C. 2011). Plaintiff connects his allegations by describing them as part of OPS management's desire to "change the culture" of the police force by ridding it of its Black officers, or at least by not promoting them. *See* Compl. ¶¶ 27–34. He claims that those efforts by management persisted over eight years, between 2014 and 2021, during which time he was consistently passed over for promotion and subjected to other discriminatory actions. *See id.* ¶ 79. Moreover, while multiple people were involved in the hiring process, the only manager who was consistently involved, and who is at the center of many of Plaintiff's allegations, is Lieutenant Taylor. *See id.* ¶¶ 27–29, 39–

52, 57–66 (alleging that Taylor made discriminatory comments, changed Plaintiff's work schedule, gave him an undeserved low performance rating, and did not tell him about certain trainings); *Laughlin v. Holder*, 923 F. Supp. 2d 204, 219 (D.D.C. 2013) (finding acts could constitute an unlawful employment practice if "perpetrated by a core group of senior decisionmakers" who made the "job less desirable and more difficult").

The court will therefore consider Plaintiff's allegations before July 15, 2021, for his hostile work environment claim.

### ii.     Merits

Defendant argues that the court should dismiss this claim because Plaintiff "fails to allege a pervasive pattern of severe harassment." MTD at 15. Plaintiff responds that his alleged mistreatment "has not only disrupted" his "professional growth but has also impacted his financial stability, mental well-being, and his ability to care for his family, demonstrating a hostile and discriminatory atmosphere that has permeated." Opp'n at 8–9.

Under Title VII, a hostile work environment exists when an employer subjects an employee to "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation omitted). "Workplace conduct is not measured in isolation." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001). Courts must look to the "totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008). The "conduct must be extreme to amount to a change in the terms and conditions of employment" and create a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "[I]solated incidents

(unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (internal quotation marks omitted).

While the acts Plaintiff complains of may have offended him, they are insufficient to support a hostile work environment claim. Plaintiff alleges that over eight years, management repeatedly denied him promotions, changed his work schedule so that he could not take care of his sick wife, spread rumors about him, gave him an undeservedly low performance rating, and did not tell him about certain training events. Compl. ¶¶ 1–94. But few of Plaintiff's allegations are "expressly focused on his" race or age. *Baloch*, 550 F.3d at 1201 (affirming dismissal of plaintiff's hostile work environment claim in part because "none of the comments or actions directed at [plaintiff] expressly focused on his race, religion, age, or disability."). For example, Plaintiff concedes that Defendants told him he was not promoted because of a veteran's preference. *E.g.*, Compl. ¶ 26. But, in any event, being denied a promotion is not "so objectively offensive as to alter the conditions of [Plaintiff's] employment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (internal quotation marks omitted). The only acts connected to Plaintiff's protected status are Taylor's comment that he was trying to "change the culture" of the workforce to hire "more Caucasian officers," Compl. ¶ 27, and his frequent questions about Plaintiff's age. *Id.* ¶ 28. But complaints about "offhand comments" do not necessarily amount to a hostile work environment. *See Faragher*, 524 U.S. at 788.

Moreover, Plaintiff does not claim that the training events or his work schedule were conditions of his employment. While negative performance reviews that result in a denied bonus can be an adverse action, *see Weber v. Battista*, 494 F.3d 179, 185 (D.C. Cir. 2007), "performance reviews [] do little to evince abusive conditions" unless they are "uniformly negative" or if they exclude "recommended areas of improvement." *Brooks v. Grundmann*, 748 F.3d 1273, 1276–77

(D.C. Cir. 2014). Plaintiff does not allege that his performance reviews were uniformly negative or excluded areas of improvement. Similarly, workplace rumors are not usually severe and pervasive enough to alter the conditions of employment. *Clemmons v. Acad. for Educ. Dev.*, 107 F. Supp. 3d 100, 121 (D.D.C. 2015) (granting an employer's summary judgment where plaintiff's hostile work environment claim consisted of allegations that her coworkers spread "false rumors about her").

Accordingly, the court will grant Defendant's motion to dismiss Plaintiff's hostile work environment claim.

### C. Sex Discrimination (Count I)

Defendant moves to dismiss Plaintiff's sex discrimination claim because Plaintiff does not claim he was discriminated against because he was male. MTD at 10–11. The court agrees.

Plaintiff alleges three discriminatory acts post-July 15, 2021, but connects none to sex discrimination. He claims that OPS did not hire him for the March and July 2021 vacancies, and that management spread a rumor about him permitting a sick employee to attend work. Compl. ¶¶ 71–78, 82–85. But both vacancies were filled by males. *See* Compl. ¶ 74 (alleging that Taylor was selected for the March 2021 Vacancy); *Compare id.* ¶¶ 58, 75–77, 84, *with* Def.'s Ex. A at 0321 (indicating that Velasquez was selected for the Lieutenant position posted in July 2021). Although Plaintiff alleges that "[o]ther [female] employees who were similarly situated . . . have been treated more favorably," Compl. ¶ 105, he does not identify any female employee who was selected over him or otherwise treated more favorably. *See generally* Compl. ¶¶ 71–78; *Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008) (holding that an "inference" of "discrimination is not reasonable" if plaintiff provides no evidence showing how a comparator was favored). Nor does Plaintiff connect the January 2022 incident regarding the sick employee to sex at all. *Id.* ¶¶ 82–85; *Brown v. Sessoms*, 774 F.3d 1016, 1020 (D.C. Cir. 2014) ("[P]laintiff's

obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.").

The court will therefore grant Defendant's motion to dismiss Plaintiff's sex discrimination count.

### D. Race Discrimination (Count II)

Defendant moves to dismiss Plaintiff's race discrimination claim because the individuals who were hired for the March and July 2021 vacancies were the same race as Plaintiff, and Plaintiff does not allege that either was unqualified. MTD at 11–13.

OPS repeatedly told Plaintiff that he was not promoted because he was not a veteran. Compl. ¶¶ 67, 71–72, 77–78. In Plaintiff's view, however, he was overlooked because Taylor was trying to "change the culture of" the police department by hiring "more Caucasian officers." *Id.* ¶ 27.

Despite Taylor's statement, Defendant selected Black men to fill the March and July 2021 vacancies. Taylor, who was hired for the March 2021 vacancy, identifies as "African American." Def.'s Ex. A at 0312; Compl. ¶¶ 71, 74. Velasquez, who was hired for the July 2021 vacancy, identifies as "Black-Hispanic." Def.'s Ex. A at 0321; Compl. ¶¶ 58, 75–77, 84; *Kilpatrick v. Paige*, 193 F. Supp. 2d 145, 159 (D.D.C. 2002) ("Since the selectee is of the same race . . . as the plaintiff, the plaintiff fails to establish a prima facie case of" race discrimination.). That perhaps Taylor was "pre-selected" for the position does not strengthen Plaintiff's Title VII race discrimination claim, unless it is tied to disparate racial treatment. Compl. ¶ 74; *Arnold v. Salazar*, 970 F. Supp. 2d 1, 8 (D.D.C. 2013) ("[P]reselection that is 'not on some basis prohibited by Title VII does not violate Title VII.'" (quoting *Oliver-Simon v. Nicholson*, 384 F. Supp. 2d 298, 310 (D.D.C. 2005)).

Nor can this court infer that Taylor or Velaquez were unqualified for the supervisory roles. A Title VII plaintiff must "dispel any obvious alternative explanation[s] for the adverse employment action," which can include the selectee's "absolute or relative lack of qualifications." *Ho v. Garland*, 106 F.4th 47, 53–54 (D.C. Cir. 2024) (internal quotation marks and citation omitted from first quoted part). Plaintiff does not claim that either Taylor or Velasquez were unqualified; he claims only that *he* was qualified. Compl. ¶ 20 (alleging that Plaintiff has over 44 years of law enforcement experience). But Plaintiff's qualifications do not establish that the individuals selected were unqualified or less qualified than he was.

Similarly, Plaintiff does not allege that the investigation regarding the sick employee was because of his race. *See generally id.* ¶¶ 82–85. To be sure, Plaintiff claims that the investigation was built on a faulty premise; he contends that "Officer Pathak emailed []Velazquez, copying Plaintiff, confirming that Plaintiff did not tell Officer Pathak to come to work while he was sick." *Id.* ¶ 85. That Plaintiff's co-workers were mistaken or untruthful about his actions, however, does not raise, without more, an inference that the investigation was motivated by race. *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006) (internal quotation marks and citation omitted) ("While no magic words are required . . . the complaint must in some way allege unlawful discrimination."). The court will therefore also grant Defendant's motion to dismiss Plaintiff's race discrimination claim.

### E. Retaliation (Count IV)

Defendant moves to dismiss Plaintiff's retaliation claims because he "fails to allege a causal link" between his EESDO complaint and Defendant's allegedly retaliatory conduct. MTD at 16.

Title VII prohibits an employer from discriminating against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or

hearing." 42 U.S.C. § 2000e–3(a); *see Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 274 (2009) (discussing Title VII's anti-retaliation provision). A retaliation claim is viable only if the plaintiff shows he "engaged in a statutorily protected activity, the employer treated the plaintiff adversely, and a causal connection existed between the two." *Winston v. Clough*, 712 F. Supp. 2d 1, 11 (D.D.C. 2010). That adverse treatment must be material, meaning that it must cause "objectively tangible harm" that is not "unduly speculative." *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (internal quotation marks and citation omitted).

Plaintiff claims that after he filed his EESDO complaint on August 29, 2021, an emergency medical technician and a health nurse reported that he directed an officer to come to work when the officer was suffering from COVID-like symptoms, sparking a subsequent investigation. Compl. ¶¶ 80, 82–85. The sick employee then emailed Velasquez, "copying Plaintiff, confirming that Plaintiff did not tell" him "to come to work while he was sick." *Id.* ¶ 85.

Plaintiff does not allege that he experienced any significant change in his employment status or benefits because of this false report or his EESDO complaint, however. *See Bridgeforth*, 721 F.3d at 663 (a materially adverse action typically involves a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits"). The D.C. Circuit has held that "in order to support a claim of retaliation[,] a plaintiff must demonstrate the employer's challenged action would have been material to a reasonable employee, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (internal quotation marks and citation omitted). It is difficult to determine how an unfounded rumor about ordering a sick employee to work, even when it resulted in a subsequent investigation, posed an

"an *objective* harm to [Plaintiff's] reputation or prospects." *Rattigan v. Holder*, 604 F. Supp. 2d 33, 54 (D.D.C. 2009) (emphasis in original); *Guillen-Perez v. District of Columbia*, 415 F. Supp. 3d 50, 70 (D.D.C. 2019) (finding that "general negative treatment" is not a materially adverse action).

Consequently, because Plaintiff fails to allege a material adverse event that occurred because of his protected activity, the court will grant Defendant's motion to dismiss his retaliation claim.

### F. Section 1981 (Count V)

Defendant argues that Plaintiff's Section 1981 claim must be dismissed because it is barred by sovereign immunity, MTD at 17–18. The court agrees.

Section 1981 gives all U.S. citizens "the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. When a plaintiff brings an action seeking damages against the Secretary of the Smithsonian, that encroaches upon the government's sovereign immunity because such funds "would be paid from the public treasury." *Strong-Fisher v. LaHood*, 611 F. Supp. 2d 49, 53 (D.D.C. 2009); Compl. at 27 (seeking compensatory and punitive damages against the Secretary of the Smithsonian).

The United States, as a sovereign, "is immune" from suit unless "it consents to be sued." That consent "must be unequivocally expressed," it cannot be inferred. *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (internal quotation marks and citation omitted). "The absence of any language in Section 1981 indicating that the statute authorizes suits against the federal government or its employees," however, "demonstrates that the United States has not waived its sovereign immunity" for that statute. *Prince v. Rice,* 453 F. Supp. 2d 14, 26 (D.D.C. 2006); *DynaLantic Corp. v. U.S. Dep't of Def.*, 885 F. Supp. 2d 237, 291 (D.D.C. 2012) ("Section 1981 does not apply

to actions taken under the color of federal law, nor does it permit suit against instrumentalities of the federal government.").

Plaintiff's Section 1981 fails for two additional reasons. First, the Supreme Court has held that Title VII "provides the exclusive judicial remedy for claims of discrimination in federal employment." *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 835 (1976). Second, Section 1981, by its terms, protects only certain enumerated rights "against impairment by nongovernmental discrimination and impairment under color of *state* law." 42 U.S.C. § 1981(c) (emphasis added). This language does not apply to actions taken under *federal* law—Plaintiff's claim here. Compl. ¶¶ 169–79. The court will thus grant Defendant's motion to dismiss Plaintiff's Section 1981 claim.

### G. Age Discrimination (Count VI)

Finally, Defendant moves to dismiss Plaintiff's age discrimination claim because he points to no facts indicating that the allegedly discriminatory treatment, including the denials of promotion and the investigation regarding the sick employee, was because of his age. MTD at 13–14. Plaintiff counters that both people hired for the supervisory positions were nearly twenty years younger. Opp'n at 7.

The ADEA protects employees aged forty and older from job discrimination. 29 U.S.C. § 623(a). A successful ADEA claim requires that the plaintiff (i) suffered an adverse employment action, (ii) because of the plaintiff's age. *See Baloch*, 550 F.3d at 1196. A plaintiff must show by a preponderance of the evidence "that age was the 'but-for' cause of the challenged employer decision." *Steele v. Esper*, 419 F. Supp. 3d 96, 107 (D.D.C. 2019). Being denied a promotion may constitute an adverse action if the plaintiff applied for the position, was qualified for it, and someone else, not of his protected class, was selected. *See Cones v. Shalala*, 199 F.3d 512, 516 (D.C. Cir. 2000) (noting an adverse action in the Title VII context). A plaintiff states an age discrimination claim if he "alleges that the employer made a blatant discriminatory statement

together with a plausible connection between that statement and an adverse employment decision." *Townsend v. United States*, 236 F. Supp. 3d 280, 301 (D.D.C. 2017).

Plaintiff sufficiently pleads both ADEA elements. He is over 60 years old, was not selected for either the March and July vacancies, and OPS selected Taylor and Velasquez, who were 46 and 47 years old, respectively. Compl. ¶ 1; Opp'n at 7; Def.'s Ex. A at 0312, 0321. While OPS told Plaintiff that he was not promoted because he was not a veteran, Plaintiff points out that Velasquez also was not a veteran. Opp'n at 7. He also alleges that after he was promoted, Taylor "asked Plaintiff on numerous occasions" when he was "going to retire." Compl. ¶ 28; *see, e.g.*, *Bowe–Connor v. Shinseki*, 845 F. Supp. 2d 77, 89 (D.D.C. 2012) (denying a motion to dismiss ADEA claim where plaintiff alleged that she had been called "one of the 'GOLDEN GIRLS'"); *Miller v. Gray*, 52 F. Supp. 3d 62, 67–68 (D.D.C. 2014) (concluding that employer's stated desire for "a greater balance of older and younger teachers" was sufficient to state a claim for age discrimination). Given that both selectees in this case were significantly younger than Plaintiff, as well as Taylor's repeated inquiries about Plaintiff's retirement plans, Plaintiff has plausibly alleged that his age could have been a but-for cause for why he was not promoted.

### IV.     CONCLUSION

For the above reasons, Defendant's Motion to Dismiss is GRANTED IN PART and DENIED IN PART. A corresponding order shall follow.

Date: September 26, 2025

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge